# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 9, 2021      Decided February 25, 2022

No. 21-7034

LEONARD A. SACKS & ASSOCIATES, P.C.,
APPELLANT

v.

INTERNATIONAL MONETARY FUND,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02266)

*Donald H. Spence, Jr.* argued the cause for appellant. With him on the briefs was *Leonard A. Sacks*.

*James R. Newland, Jr.* argued the cause for appellee. With him on the brief were *Kiran Aftab Seldon* and *Renee B. Appel*.

Before: HENDERSON and PILLARD, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Plaintiff Leonard A. Sacks & Associates, P.C. (Sacks) sued the International Monetary Fund

(Fund or IMF) to modify or vacate an arbitration award it obtained against the Fund. The Fund asserted its immunity, and the district court dismissed the case. Sacks does not dispute the Fund's general entitlement to immunity under its Articles of Agreement, which have legally binding effect in the United States pursuant to the Bretton Woods Agreements Act (Bretton Woods Act). But Sacks claims that, by including in the parties' contract an agreement to arbitrate under the rules of the American Arbitration Association (AAA) and the laws of the District of Columbia, the Fund effected a limited waiver of that immunity to allow judicial enforcement, modification, or vacatur of any resulting arbitration award. Sacks' argument makes good sense: Both the AAA Rules and D.C. law contemplate judicial involvement in the enforcement of arbitral awards, so arguably the contract does as well. But a waiver of the immunity of an international organization must be explicit. Because the Fund's contract with Sacks expressly retains the Fund's immunity, reiterating it even within the arbitration clause itself, we affirm.

## BACKGROUND

The International Monetary Fund "is an international organization whose purposes include promoting international monetary cooperation, facilitating the expansion and balanced growth of international trade, promoting exchange stability among its 190 member countries, and providing temporary financial assistance to its member countries experiencing balance of payments difficulties." Appellee Br. at 11. Sacks is an experienced construction law practice with a twenty-year history of working with the Fund even before the representation that gave rise to this case.

In 2011, the Fund hired Sacks to negotiate disputed claims of various contractors that worked on the renovation of the

Fund's Washington, D.C. headquarters. The parties' contract asserts the Fund's immunity from suit and provides that any disputes not settled by mutual agreement shall be resolved by arbitration. As to immunity, in a clause entitled "Immunities of the International Monetary Fund: Taxes and Disputes," the contract recites that Article IX of the Fund's Articles of Agreement, as incorporated into U.S. law by the Bretton Woods Act, "provides that the International Monetary Fund, its property and its assets, wherever located and by whomsoever held, are immune from every form of judicial process." App. 63. It goes on to say: "Accordingly, and notwithstanding anything to the contrary in this Agreement or any documents to which it refers, it is expressly agreed and understood that" any disputes are to be resolved not by litigation, but by arbitration. App. 64.

The arbitration clause, nested within that immunity-from-taxes-and-disputes provision, states:

> Any controversy [or] claim arising out of or relating to the Contract or any breach, termination [or] invalidity thereof, shall be settled by the mutual agreement of the parties hereto, provided that failing such agreement the dispute shall be finally settled by binding arbitration administered by the American Arbitration Association (AAA) in accordance with its Commercial Arbitration Rules then in effect . . . . The arbitral case shall be decided according to the terms of the Contract and the law of the District of Columbia. If a claim or dispute would have been barred by a time limitation had it been asserted in a court of the District of Columbia, then the Tribunal shall declare the claim or dispute to be extinguished on the merits. Each party agrees to implement any requirements of the arbitrator or

arbitrators directed to it in accordance with those rules.

App. 63-64. The arbitration clause concludes with a sentence reiterating the Fund's immunity: "It is understood and agreed that the submission of a claim or dispute to arbitration shall not excuse either party from performing its obligations under the contract, and shall not be considered to be a waiver of the immunities of the IMF." App. 64.

Early in 2016, in an effort to hasten the resolution of the contractors' claims and get the project back on track, Sacks and the Fund amended their contract to provide for a "reverse contingent fee" on settlements of any of twelve remaining contractors' claims if Sacks succeeded in wrapping them up before the end of March 2016. App. 32. By mid-April 2016, Sacks had settled all but two of the claims. Sacks alleged that its legal work on the settlements saved the Fund about $45 million. Sacks contends that the Fund itself at that point calculated Sacks' fee under the Agreement to be $4,152,945 but paid only $2,369,000. The Fund rebuffed Sacks' protests of underpayment with representations "that the parties would 'square up' after one of the remaining final subcontractor claims - the Halac claim - was settled." App. 13. Once the Halac claim settled in May 2017 and Sacks again requested an accounting for its services, the Fund responded that it had already paid all the fees it owed.

Per the parties' contract, Sacks filed a demand for arbitration with the AAA. The arbitration panel awarded Sacks $39,918.82 plus interest in additional compensation for Sacks' legal work on the Halac claim after the prior fee payment, but denied Sacks' claim of underpayment in connection with the earlier work.

Sacks sued the Fund in D.C. Superior Court for modification or vacatur of the arbitration award. Sacks claimed that the award should be vacated pursuant to D.C. Code § 16-4423 on grounds that it "was procured by undue means," and "was the result of misconduct by the arbitrators." Motion to Modify and/or Motion to Vacate Arbitration Award of Leonard A. Sacks & Associates, P.C. at 1, *Leonard A. Sacks & Assocs., P.C. v. Int'l Monetary Fund*, No. 2020 CA 000711 C (D.C. Super. Ct. Jan. 30, 2020), App. 11. Sacks also claimed that the award was "defective as [to] the calculation of the amount awarded to Sacks and should be modified" per D.C. Code § 16-4424. *Id.*

The Fund specially appeared for the limited purpose of removing the case to federal court and asserting its immunity from suit. The Fund sought removal under the Bretton Woods Act, which establishes that actions by or against the IMF arise under federal law and may be litigated in federal court. *See* 22 U.S.C. § 286g. That same day, it also moved to dismiss the suit on immunity grounds pursuant to its Articles of Agreement, the relevant provisions of which are given effect in the United States by the Bretton Woods Act, 22 U.S.C. § 286h.

Sacks did not dispute that the Fund is generally entitled to immunity from suit, but asserted the contract waived immunity relating to enforcement of the arbitration clause. The contract expressly provided for arbitration pursuant to the AAA Rules, which contemplate courts' entry of judgment on arbitral awards, and D.C law, which permits judicial modification or vacatur for certain narrowly circumscribed reasons. Rule R-52(c) of the AAA Commercial Arbitration Rules provides that: "Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction

6

thereof."[1] And the D.C. Code empowers courts to modify arbitral awards on grounds such as "an evident mathematical miscalculation," § 16-4424(a)(1), or to vacate them if, among other things, the "award was procured by corruption, fraud, or other undue means," or there was "[e]vident partiality by an arbitrator," § 16-4423(a). Sacks argued that, by agreeing to an arbitration clause referencing AAA rules and D.C. law, the Fund explicitly waived its immunity against his suit seeking the modification or vacatur of the arbitrators' award on grounds those provisions contemplate.

The district court granted the Fund's motion to dismiss, rejecting each of Sacks' waiver theories. *See generally Leonard A. Sacks & Assocs., P.C. v. Int'l Monetary Fund*, No. CV 20-2266, 2021 WL 1166738 (D.D.C. Mar. 26, 2021), *reprinted in* App. 137-42. The court first disposed of Sacks' argument that the Fund waived its absolute immunity by agreeing to arbitrate under the AAA Rules. Because the contract specifically preserves the Fund's immunity "notwithstanding anything to the contrary in th[e] Agreement or any documents to which it refers," App. 64, the court held that it could not treat reference to or incorporation of the AAA Rules in the parties' contract as an express waiver. The court likewise rejected Sacks' argument that the Fund waived its

---

[1] *Commercial Arbitration Rules and Mediation Procedures*, AMERICAN ARBITRATION ASSOCIATION 29 (Oct. 1, 2013), https://www.adr.org/sites/default/files/CommercialRules_Web.pdf. *See What Happens After the Arbitrator Issues an Award*, AMERICAN ARBITRATION ASSOCIATION 2, https://www.adr.org/sites/default /files/document_repository/AAA229_After_Award_Issued.pdf ("Under federal and state laws, there are only a few ways to challenge an arbitrator's award. The Federal Arbitration Act ('FAA') and some state laws provide the reasons why an award can be vacated (thrown out), modified (changed), or corrected. Those reasons are very limited in general.").

immunity by agreeing to arbitrate under D.C. law. The contract states that "[t]he arbitral case shall be decided" according to the contract's terms and D.C. law, App. 64, which the court read to specify the substantive law the arbitrators should apply in interpreting the contract, not to invite review of their awards.

Finally, the district court distinguished *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2001), on which Sacks substantially relied. The court noted that the contract in *C & L Enterprises*, unlike the contract at issue in this case, included a provision explicitly recognizing that an arbitral award thereunder could be "reduced to judgment" by a court. *Sacks*, 2021 WL 1166738, at *3, App. 141 (quoting *C & L Enters.*, 532 U.S. at 418-19). The court also pointed out that the IMF contract's identification of D.C. law as applying in the "arbitral case" materially differed from the *C & L Enterprises* contract's choice-of-law provision, *Sacks*, 2021 WL 1166738, at *3, App. 141-42, which identified the law under which the "contract shall be governed," 532 U.S. at 415. Finally, the court concluded that *C & L Enterprises* does not support Sacks' waiver claim because, "unlike the contract in that case, the one at issue here specifically reaffirms the Fund's immunity." *Sacks*, 2021 WL 1166738, at *3, App. 142.

Sacks timely appealed.

**ANALYSIS**

We review an international organization's claim of immunity *de novo*. *See Nyambal v. Int'l Monetary Fund*, 772 F.3d 277, 280 (D.C. Cir. 2014).

We start from the shared premise that the Fund is generally immune from suit. The Fund's immunity is more protective than the immunity afforded international organizations under

8

the International Organizations Immunities Act (IOIA), 22 U.S.C. § 288a(b). *See Nyambal*, 772 F.3d at 281; *see also Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 771-72 (2019) (including the Fund in a list of international organizations with charters that "specify a different level of immunity" from what the IOIA provides). Article IX § 3 of the Fund's Articles of Agreement, which has full force and effect in the United States under the Bretton Woods Act, 22 U.S.C. § 286h, grants the Fund absolute immunity from suit absent its express waiver. Thus, the Fund "enjoy[s] immunity from every form of judicial process except to the extent that it expressly waives its immunity for the purpose of any proceedings or by the terms of any contract." *Nyambal*, 772 F.3d at 281 (alterations in original) (quoting Articles of Agreement, Art. IX § 3).

Sacks argues that the arbitration clause in the Fund's contract for Sacks' legal services waived the Fund's immunity from suit for the limited purpose of allowing Sacks to enforce—or, conversely, to modify or vacate—any resultant arbitration award. We thus look to the contract for an expression of any such waiver. *See C & L Enters.*, 532 U.S. at 418; *Nyambal*, 772 F.3d at 282.

The Supreme Court in *C & L Enterprises* provided a framework for determining whether an entity waived its immunity by agreeing to arbitrate. The text of the contract at issue there, like the one in this case, contained no affirmative immunity waiver. Rather the claim there, as here, rested on the incorporation of processes or laws that contemplate a role for courts. The Court in *C & L Enterprises* addressed "the impact of an arbitration agreement" within "a standard form construction contract signed by the parties" on "a tribe's plea of suit immunity." 532 U.S. at 414. "The question presented [wa]s whether the Tribe waived its immunity from suit in state court when it expressly agreed to arbitrate disputes with C & L

relating to the contract, to the governance of Oklahoma law, and to the enforcement of arbitral awards 'in any court having jurisdiction thereof.'" *Id.*

The Court held that "by the clear import of the arbitration clause, the Tribe is amenable to a state-court suit to enforce an arbitral award in favor of contractor C & L." 532 U.S. at 414. Several features of the contract between the Tribe and the contractor supported that conclusion. First, the contract "require[d] resolution of all contract-related disputes between C & L and the Tribe by binding arbitration," and specified that the AAA Rules for the construction industry would govern. *Id.* at 419. Those Rules, in turn, provided: "Parties to these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof." *Id.* at 415 (quoting American Arbitration Association, Construction Industry Dispute Resolution Procedures, R-48(c) (Sept. 1, 2000)). Second, the contract stated it was "governed by the law of the place where the Project [wa]s located." *Id.* The Project was in Oklahoma, and Oklahoma law empowered courts to enforce arbitration awards. *Id.* at 415, 419-20. Third, "the contract specifically authorize[d] judicial enforcement of the resolution arrived at through arbitration." *Id.* at 422. C & L's arbitration clause stated that "[t]he award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." *Id.* at 415. The Court was therefore satisfied "that under the agreement the Tribe proposed and signed, the Tribe clearly consented to arbitration and to the enforcement of arbitral awards in Oklahoma state court," and "thereby waived its sovereign immunity from C & L's suit." *Id.* at 423.

Sacks relies on two key similarities between the contract at issue here and the C & L contract. Like the C & L contract,

the IMF contract provides that disputes "shall be finally settled by binding arbitration administered by the American Arbitration Association (AAA) in accordance with its Commercial Arbitration Rules then in effect."  App. 64; *see C & L Enters.*, 532 U.S. at 419.  And, like the AAA construction industry rules at issue in *C & L Enterprises*, Rule 52 of the AAA Commercial Arbitration Rules provides that:  "Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof."[2]  Sacks argues that by incorporating the AAA Rules the Fund, like the Tribe in *C & L Enterprises*, consented to the courts' jurisdiction to enter judgment on an arbitration award. And Sacks contends that waiver to allow a court to enter judgment on an award encompasses a court's authority to modify or vacate the award where circumstances so warrant.

Sacks also points to the provision in the IMF contract stating that "[t]he arbitral case shall be decided according to the terms of the Contract and the law of the District of Columbia," App. 64, and notes that D.C. law contains limited provision for the modification, D.C. Code § 16-4424, and vacatur, D.C. Code § 16-4423, of arbitration awards.  Similarly, the C & L contract set Oklahoma law as the governing law, and Oklahoma law provided for the enforcement of arbitral awards in court.  532 U.S. at 415.  Sacks thus argues that, by selecting D.C. law to govern the contract, the Fund waived its immunity from judicial modification or vacatur of an award on grounds recognized by D.C. law.

But Sacks does not account for two key features of the IMF and C & L contracts that differ: The IMF contract contains express preservations of immunity that were absent from the C

---

[2] *See supra* note 1.

& L contract. And the C & L contract explicitly provided for entry of judgment on arbitral awards, whereas the IMF contract does not. The contract at issue in *C & L Enterprises* was a standard form contract. It did not mention Tribal immunity at all, and it went beyond deeming final any award entered pursuant to its arbitration clause to provide that "judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." 532 U.S. at 415. The Fund's arbitration clause, by contrast, appears in a section titled "Immunities of the International Monetary Fund," underscoring that the Fund views resolution of disputes by arbitration as part and parcel of preserving its immunity from judicial process. App. 63. The IMF contract broadly affirms that the Fund's Articles of Agreement render it "immune from every form of judicial process." App. 63. And the concluding sentence of the arbitration clause itself declares that "[i]t is understood and agreed that the submission of a claim or dispute to arbitration . . . shall not be considered to be a waiver of the immunities of the IMF." App. 64.

Despite the IMF contract's inclusion of the kinds of cross references to AAA Rules and state law that supported the waiver holding in *C & L Enterprises*, this contract's express preservations of immunity and lack of any contemplation that a court might enter judgment on the award distinguishes this case. Indeed, although the Fund itself does not cite this particular phrase, its contract contains a somewhat unusual commitment that "[e]ach party agrees to implement any requirements of the arbitrator or arbitrators directed to it in accordance with those rules," App. 64—perhaps acknowledging that it is up to the parties to carry out any award in the absence of judicial involvement. In the face of an explicit, blanket assertion that submission to arbitration "shall not be considered to be a waiver of the immunities of the IMF," App. 64, and the absence of any express contemplation of

judicial involvement as was present in the C & L contract, we cannot say that the Fund explicitly waived immunity even for the limited purpose of determining the validity (or not) of an arbitral award and reducing it to judgment.

Sacks disagrees, contending that the contract does not actually preserve the Fund's immunity from judicial modification or vacatur of an arbitration award, but preserves it only for other purposes. Sacks reads the concluding sentence of the arbitration clause to mean that "[a]fter Sacks filed its claim with the AAA, it was understood that the Fund's immunity as to all . . . issues not 'arising out of or relating to the Contract' remained intact," even as "immunity was waived as to dispute resolution through arbitration in accordance with the AAA Rules." Reply Br. at 9. That explanation is unpersuasive. Nobody would think that by agreeing to arbitrate "[a]ny controversy [or] claim arising out of or relating to the Contract or any breach, termination [or] invalidity thereof," App. 64, the Fund ran a risk of waiving its immunity regarding issues unrelated to the contract. It makes no sense that the Fund would restate its immunity as it did to guard against that unlikely prospect. Rather, given *C & L Enterprises*, the natural reading is that the Fund was concerned that its agreement to arbitrate might subject it to the kinds of limited judicial review to which arbitration awards are ordinarily subject. The Fund's insistence in the arbitration clause itself that it was not waiving its immunity suffices to contradict the implication that it was.

## CONCLUSION

The Fund's entitlement to absolute immunity from suit, together with the fact that it explicitly reaffirmed its immunity in its agreement to arbitrate with Sacks, compels us to affirm. It is true, as Sacks argues, that the Court in *C & L Enterprises* observed that an arbitration "regime has a real world objective;

it is not designed for regulation of a game lacking practical consequences," 532 U.S. at 422, and concluded the arbitration clause before it would be "meaningless if it did not constitute a waiver of whatever immunity" the Tribe otherwise had, *id.* (quoting *Native Vill. of Eyak v. GC Contractors*, 658 P.2d 756, 760 (Alaska 1983)). As IMF counsel acknowledged at oral argument, absent waiver, the Fund's immunity from suit entitles it to ignore an arbitration award against it. Oral Arg. Rec. 12:27-12:31. Thus, although the IMF contract says any disputes arising from or relating to it shall be "finally settled by binding arbitration," App. 64, its arbitration clause does not actually bind the Fund to the arbitral result in any meaningful legal sense.

But the concerns the Court expressed in *C & L Enterprises* are alleviated here by the Fund's explicit preservation of its immunity. The assertion of immunity within the arbitration clause itself makes a difference: Parties in Sacks' position have a choice whether to avoid agreeing to such terms with immune entities like the IMF without at least a limited waiver of their immunity, or—as Sacks did here—to contract on the IMF's terms. Unlike the contractor in *C & L Enterprises*, Sacks had reason to believe the normal safeguards ordinarily associated with binding arbitration had been contracted away. *Cf. C & L Enters.*, 532 U.S. at 422 ("And to the real world end, the contract specifically authorizes judicial enforcement of the resolution arrived at through arbitration."). Absent an explicit waiver that is not present here, we will not disturb the terms the Fund offered and Sacks, an experienced law firm, chose to accept.

For the foregoing reasons, we affirm.

*So ordered*.